Anne FARRIS, Appellee Cross-Appellant,

v.

BOARD OF EDUCATION OF the CITY OF ST. LOUIS, Appellant Cross-Appellee.

Nos. 76–1633, 76–1649.

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1977.

Decided May 17, 1978.

Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Assoc. Gen. Counsel, and Charles L. Reischel, Atty., EEOC, Washington, D. C., on brief for EEOC, amicus curiae.

Thomas E. Tueth, St. Louis, Mo., for appellant-cross-appellee.

Clyde C. Farris, Jr., St. Louis, Mo., for appellee-cross-appellant.

Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and ROSS, Circuit Judges.

VAN OOSTERHOUT, Senior Circuit Judge.

Anne Farris is a high school teacher employed in the St. Louis public school system; she has taught there continuously since 1967. In 1969 she became pregnant and applied for a maternity leave of absence as was then required by the school board's regulation 7.733.[1] That regulation required a pregnant teacher to take a mandatory maternity leave of absence from teaching without pay for a minimum period of 168 days beginning no later than 140 days prior to the expected birth and continuing at least until the child was 28 days old.

The school board also had in effect a policy which denied an annual incremental salary increase to any teacher absent for a total of more than fifty days during the school year. However, leaves of absence for personal illness or for advanced study were not counted in the fifty day total, and a teacher returning from a leave of absence for one of those two reasons was assigned to the salary to which he would have been entitled had the absence not occurred.[2]

Farris applied for the pregnancy leave of absence in November 1969 and the leave was granted in December 1969. She did not teach from January 24, 1970, through the end of the second semester in June 1970. Her child was born in late June 1970, and she resumed her teaching duties in September 1970.

Due to the fact she was absent more than fifty days during the 1969-70 school year, Farris did not receive her incremental salary raise in September 1970. Each year thereafter she has been one step lower on the salary scale than she would have been had she not lost an increment in 1970. From the 1970-71 school year through the 1975-76 school year, the total difference amounts to $2,146. She also was not paid any wages for the period of her mandatory maternity absence.[3]

The provisions of Title VII, 42 U.S.C. § 2000e *et seq.*, became applicable to school boards in March 1972. Pub.L. 92-261, 86 Stat. 103. Farris filed a complaint with the EEOC on July 21, 1972, charging the Board with sex discrimination under Title VII and seeking to recoup lost income from the denial of the incremental raise. Plaintiff's complaint was eventually filed with the district court on March 12, 1975.

---

1. 7.733 Maternity Leave of Absence.

    \* \* \* \* \* \*

    B. The supervisor of health services shall review the statement of the attending physician and in consultation with the applicant shall establish jointly with her the date of the beginning of the maternity leave of absence. The supervisor of health services shall inform the applicant that Rules and Regulations of the Board of Education make it mandatory that she take a maternity leave of absence without pay for a minimum period of 168 calendar days which shall begin no later than 140 calendar days prior to the expected birth of the infant and continue until the infant has attained an age of 28 days. The required leave of 168 calendar days may be extended to a maximum of 730 calendar days.

2. According to the stipulation, the yearly incremental raise is automatic and given to all satisfactory teachers:

    7.164 When Salaries Are Not to Be Increased

    A. Any principal or teacher appointed after the close of the first day of the second semester of the scholastic year shall not receive an increase of salary the next succeeding year unless recommended by the Superintendent of Schools.

    B. Any principal or teacher who shall have been absent more than fifty school days in the aggregate during the school year shall not receive the annual increment unless recommended by the Superintendent of Schools. However, when any principal or teacher is granted a leave of absence for the purpose of advanced study or for personal illness, upon his return to service, he shall be assigned to the scheduled salary to which he would have been entitled had the absence not occurred.

3. The district court, in an unreported memorandum opinion dated June 23, 1975, concluded that the statute of limitations began running on this portion of her claim when she returned to work in August 1970 and that this portion of her claim was now time-barred. Farris does not contest this holding on appeal.

In a memorandum opinion reported at 417 F.Supp. 202 (E.D.Mo.1976), the district court granted the plaintiff's summary judgment motion, awarding her back pay only from 1972, the effective date of the amendments which subjected school boards to liability.[4] Although the court concluded that the 1972 amendments should not be applied retroactively to remedy a past discriminatory event, it nevertheless held that "relief may be granted under the Act to remedy *present effects* of discriminatory acts which occurred prior to the effective date of the Act." *Id.* at 206 (emphasis added). The court made this holding on the strength of our decision in *Marquez v. Omaha District Sales Office*, 440 F.2d 1157 (8th Cir. 1971), which concluded: "While it is true, * * that the Act was intended to have prospective application only, relief may nevertheless be granted to remedy *present and continuing effects of past discrimination.*" *Id.* at 1160 (emphasis added).

The school board has appealed, contesting both this holding and the timeliness of Farris' filing in the district court. Farris has cross-appealed, seeking additional attorney's fees.

Since the time of the district court's decision and of the oral arguments before us, the Supreme Court has decided *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). The parties have filed supplemental briefs concerning the effect of these decisions on the district court's conclusion that it could redress the "continuing violation" in this case under Title VII.[5]

The "continuing violation" issue is the sole one we reach. We conclude that *United Air Lines, Inc. v. Evans, supra,* precludes recovery in this case. We accordingly reverse the judgment of the district court and

remand with directions to grant the school board's cross-motion for summary judgment.

Carolyn J. Evans was employed by United Air Lines as a flight attendant from 1966 to 1968, at which time she married and was forced to resign under United's then-existing "no marriage" rule. By 1972 the rule had been abrogated. Evans was then rehired but was denied seniority credit for her prior service with United. She eventually brought suit against United alleging sex discrimination in violation of Title VII. At least by the time her case reached the Supreme Court, it was common ground that her failure to file a charge with EEOC within the requisite ninety days of the 1968 separation precluded any recovery relative to the separation itself. A more difficult issue was presented by Evans' continuing loss of benefits due to United's refusal to give credit for prior service. Despite the continuing adverse effects of the 1968 separation, the Court denied recovery.

Farris' claim differs from Evans' in at least one obvious way. Since Title VII was not applicable to school boards in 1970, Farris is an alleged victim of pre-Act discrimination. United was fully subject to Title VII in 1968, and Evans was thus an alleged victim of post-Act discrimination. It follows that the literal holding in *Evans* does not bar recovery here. Nevertheless, the Court's rationale in *Evans* leads inexorably to the conclusion that Farris, like Evans, cannot recover. We rely on the following language:

Nothing alleged in the complaint indicates that United's seniority system treats existing female employees differently from existing male employees, or that the failure to credit prior service differentiates in any way between prior service by males and prior service by females. Respondent has failed to allege

---

4. This award of back pay from the loss of the *incremental raise* amounted to $1,476 from 1972–73 through 1975–76.

5. We are also aware of the Supreme Court's recent decisions in *General Electric Company v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50

L.Ed.2d 343 (1976), and *Nashville Gas Company v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). We have no occasion, however, to consider what effect these decisions might have on the merits of Farris' Title VII sex discrimination claim.

that United's seniority system differentiates between similarly situated males and females on the basis of sex.

Respondent is correct in pointing out that the seniority system gives present effect to a past act of discrimination. But United was entitled to treat that past act as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by § 706(d). A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists. She has not alleged that the system discriminates against former female employees or that it treats former employees who were discharged for a discriminatory reason any differently from former employees who resigned or were discharged for a non-discriminatory reason. In short, the system is neutral in its operation.

*United Air Lines, Inc. v. Evans, supra,* 431 U.S. at 557–58, 97 S.Ct. at 1888–89 (footnote omitted).

Of singular significance here is the Court's statement that "[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the stat-

ute was passed", for in this sentence the Court has necessarily expressed its considered opinion on Farris' claim. Nor do we find the statement to be a particularly surprising one. For if United (because Evans did not file a timely charge) could treat as lawful under Title VII an act otherwise unlawful under Title VII, it surely follows that the school board here can treat as lawful under Title VII an act which in fact was lawful under Title VII.

Farris took her required leave of absence during the first half of 1970 and was denied an incremental salary raise in the fall of that year. No violation of Title VII occurred in 1970, however, because school boards were not subject to Title VII until 1972. It is true, of course, that even after 1972 Farris has been one step lower on the salary scale than she would have been had she not lost an increment in 1970. But "the emphasis should not be placed on mere continuity" and "the critical question is whether any present *violation* exists." Farris does not allege, nor does the record suggest, that incremental raises are in any way dependent upon sex.[6] She similarly does not allege, nor does the record suggest, that she is in any different position from other persons, men or women, who suffered an unexcused absence of fifty or more days in a school term prior to 1972. That being the case, the system cannot be said to discriminate now on the basis of sex and there is accordingly no present violation. "In short, the system is neutral in its operation."

As a factual matter, we find some support for Farris' contention that placing her one step higher on the salary scale would not adversely affect the rights of other employees. We might for this reason agree that relief is not barred in this case by Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h).[7] Cf. *International Brother-*

---

**6.** The parties stipulated:

An incremental pay increase in the St. Louis Public School System is an automatic yearly increase given to all satisfactory teachers. Such increase is not a reward given to exceptional teachers for extraordinary service. Some years incremental pay in-

creases are percentage pay increases, and other years they are equal dollar increases. See also note 2, *supra.* On July 11, 1972, the school Board rescinded Regulation 7.733 and adopted a regulation treating leaves of absence for pregnancy in the same manner as leaves of absence for personal illness or disability.

**7.** Section 703(h) in pertinent part provides:

hood of Teamsters v. United States, supra. But this is beside the point. While the Evans Court did find United's seniority system impervious to challenge under Section 703(h), the discussion of that section, 431 U.S. at 558–60, 97 S.Ct. 1885, was not essential to the Court's judgment. Rather, the Court made clear that the applicability or inapplicability of Section 703(h) to a particular case is a question quite distinct from the analytically prior question of whether a violation of Title VII otherwise occurred.[8] Indeed, the Court expressly stated: "§ 703(h) provides an *additional* ground for rejecting [Evans'] claim." *Id.* at 560, 97 S.Ct. at 1890 (emphasis added). In sum, Section 703(h) may or may not bar relief here, but relief is barred in any event because (1) any discrimination against Farris in 1970 did not violate Title VII and (2) Farris has not been subjected to discrimination since 1972.

Farris' additional contention that *Evans* should not control because Farris has been continuously employed by the school board since 1967 is without merit. As already noted, the *Evans* Court stated: "'the emphasis should not be placed on mere continuity'." *See Martin v. Georgia-Pacific Corp.*, 568 F.2d 58, 62 (8th Cir. 1977).

Accordingly, the judgment appealed from is reversed, and the cause is remanded to the district court with directions to grant the school board's cross-motion for summary judgment. Because Farris has not prevailed on the merits of her claim, she is not entitled to attorney's fees. Her cross-appeal is accordingly dismissed.

Reversed.

ROSS, Circuit Judge, dissenting.

I respectfully dissent from the majority's decision to reverse the district court in this case. Expressly conceding that the *Evans* holding "does not bar recovery here," (at 768), the majority nevertheless is persuaded by dictum in that case, which seems to be contrary to the authority in this circuit on Title VII claims of "continuing discriminatory effect" resulting from intentional pre-Act discrimination.[1] Clearly, the previous authority in this circuit on "continuing" violations had been to the contrary: "The rationale underlying the allowance of actions for continuing discrimination is to provide a remedy for *past actions* which operate to discriminate against the complainant at the *present time.*" *Olson v. Rembrandt Printing Co.*, 511 F.2d 1228, 1234 (8th Cir. 1975) (emphasis added), *citing Marquez v. Omaha District Sales Office*, 440 F.2d 1157, 1160 (8th Cir. 1971). *See also Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964*, 84 Harv.L.Rev. 1109, 1210–12 (1972); *United States v. St. Louis-San Francisco Railway Co.*, 464 F.2d 301, 307–08 (8th Cir. 1972) (en banc).

The majority result is reached without mention of relevant language from *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), an opinion announced the same day as *Evans*. The confluence of antagonistic language from these two Supreme Court opinions makes either result in this case, an affirmance or reversal, a troubled and close question. This ambiguity must at least be allowed to surface, and preferably be resolved authoritatively by the Court.

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (hereinafter

---

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or of different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system * * * provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin * * *.

8. Section 703(h) was of decisive importance in the *Teamsters* case because an otherwise redressible violation of Title VII had been established.

1. Undoubtedly, the *Evans* language referring to "a discriminatory act which occurred before the statute was passed" was dictum in that case; all the events in *Evans* occurred subse-

*Teamsters*) the United States brought a pattern and practice suit against T.I.M.E.–D.C. (a transportation company) charging it with discrimination against minorities primarily in hiring so-called "line drivers"; the union had been joined as a defendant with the company in a second action brought by the United States. One of the claims of the plaintiffs was that the present seniority system, although neutral on its face, carried the effects of earlier racial discrimination into the present by locking minority members into the inferior jobs they held as a result of prior discrimination. The Supreme Court did not dispute that the seniority system trapped minority workers and tended to promote the ill effects of prior race discrimination, but concluded that in one section of Title VII, § 703(h) [42 U.S.C. § 2000e–2(h)] Congress had afforded a measure of *immunity* to all bona fide seniority systems.[2] *Teamsters, supra,* 431 U.S. at 349–50, 97 S.Ct. 1843. The Court thus denied relief to plaintiffs who sought an alteration of the seniority system as a remedy for discrimination against them which had occurred prior to the effective date of the Act. It was the judgment of Congress, the Court concluded, that the seniority rights of workers at the time of the passage of Title VII were to remain intact, and that pre-Act discriminatees could not seek to affect these vested seniority rights.

It is apparent that § 703(h) was drafted with an eye toward meeting the earlier criticism on this issue with an explicit provision embodying the understanding and assurances of the Act's proponents: namely, that Title VII would not outlaw such differences in treatment among employees as flowed from a bona fide seniority system that allowed for full exercise of seniority accumulated before the effective date of the Act.

*Teamsters, supra,* 431 U.S. at 352, 97 S.Ct. at 1863.

This conclusion was premised on the view that § 703(h) specially immunized *seniority systems*; the Court did not indicate that

**2.** A bona fide seniority system is apparently one which is presently neutral and which did not have its "genesis in racial discrimination."

§ 703(h) immunizes *any kind* of current practice or policy which perpetuates the effects of prior discrimination, or that such a continuing discriminatory effect would not otherwise be remediable under Title VII. The Court discussed continuing discriminatory effect as follows:

One kind of practice "fair in form, but discriminatory in operation" is that which perpetuates the effects of prior discrimination.[32] As the Court held in *Griggs,*

[32] *Local 53 Asbestos Workers v. Vogler,* 407 F.2d 1047 (CA5), provides an apt illustration. There a union had a policy of excluding persons not related to present members by blood or marriage. When in 1966 suit was brought to challenge this policy, all of the union's members were white, largely as a result of pre-Act, intentional racial discrimination. The court observed: "While the nepotism requirement is applicable to black and white alike and is not on its face discriminatory, in a completely white union the present effect of its continued application is to forever deny to negroes and Mexican-Americans any real opportunity for membership." *Id.* at 1054.

*supra:* "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S., at 430, 91 S.Ct., at 853.

*Were it not for § 703(h), the seniority system in this case would seem to fall under the Griggs rationale.* The heart of the system is its allocation of the choicest jobs, the greatest protection against layoffs, and other advantages to those employees who have been line drivers for the longest time. Where, because of the employer's prior intentional discrimination, the line drivers with the longest tenure are without exception white, the advantages of the seniority system flow disproportionately to them and away from Negro and Spanish-surnamed employees who might by now have enjoyed those advantages had not the employer discriminated before the passage of the Act. *This disproportionate distribution*

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 346 n.28, 352, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

*of advantages does in a very real sense "operate to 'freeze' the status quo of prior discriminatory employment practices."* Ibid. *But both the literal terms of § 703(h) and the legislative history of Title VII demonstrate that Congress considered this very effect of many seniority systems and extended a measure of immunity to them.*

*Id.* at 349–50, 97 S.Ct. at 1861 (emphasis added).

It is my conclusion that a pre-Act discriminatee may still redress the continuing effects of a prior discriminatory act which is not perpetuated in a bona fide seniority system.

Clearly, Farris was not denied a raise pursuant to a *seniority system* in this case. Although the amount of the incremental raise in the St. Louis school system is a function of *years of service*, it is a function of that only, and the position of other workers vis-a-vis Farris is not bettered or worsened depending on whether or not she receives the extra salary each year. Therefore, the legislative policy supporting § 703(h), protecting employees from suffering for their employer's pre-Act discrimination, is not a consideration in this case. *Teamsters, supra,* 431 U.S. at 352–53, 97 S.Ct. 1843. *See Chavez v. Tempe Union High School,* 565 F.2d 1087, 1093 n. 8 (9th Cir. 1977). Moreover, Farris' situation does illustrate a "continuing violation"; she presently must endure the effect of the prior discriminatory act, a forced maternity leave, each year that she remains one notch lower on the salary scale as a result of not receiving any credit for teaching in the 1969–70 school year. The past discriminatory act "operate[s] to discriminate against the complainant at the present time." *Olson v. Rembrandt Printing Co.,* 511 F.2d 1228, 1234 (8th Cir. 1975) (en banc). *See also Cedeck v. Hamiltonian Federal Savings and Loan Association,* 551 F.2d 1136, 1137 (8th Cir. 1977); *Markey v. Tenneco Oil Co.,* 439 F.Supp. 219 (E.D.La.1977).

Though I am aware of the ambiguity which *Evans* dictum creates, I do not find it dispositive for several reasons. *Evans* involved a *post*-Act discriminatee, who, unlike Farris, had the opportunity to redress the discriminatory act in 1968 but did not make a timely filing. Farris timely filed with the EEOC after the amendments became effective. Secondly, were we to read the *Evans* dictum on "discriminatory act[s] which occurred before the statute was passed" broadly, it would conflict with what I see in *Teamsters* as a willingness to give certain pre-Act discriminatees a Title VII remedy. In *Teamsters, supra,* 431 U.S. 324, 97 S.Ct. 1843, the Court had reiterated its holding from *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) that "[u]nder the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."[3] *Teamsters, supra,* 431 U.S. at 349, 97 S.Ct. at 1861.

Finally, *Evans,* unlike the present case, also involved a seniority system; the Court concluded that allowing Evans to file a claim long after the initial discriminatory

---

**3.** In *United States v. Trucking Employers, Inc.,* 182 U.S.App.D.C. 315, 320, 561 F.2d 313, 318 (1977) the court dealt with a proposed waiver between the parties which would release the employer from " 'any and all claims arising out of any alleged discrimination * * * which may have occurred prior to 20 March, 1974' " (the filing date). The parties could not agree on the effect of this waiver, and whether it released claims arising from the future effects of past discrimination. The court said, *inter alia* :

[T]he waiver would not preclude a suit arising from the post-decree operation of any neutral practice, *other than the seniority sys-*

*tem,* that perpetuated the effects of the prior act of neutral discrimination.

*Id.* 182 U.S.App.D.C. at 321, 561 F.2d at 319.
  The court quoted from *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and then added: *"International Brotherhood of Teamsters, supra,* proceeded on the assumption that absent 703(h), a seniority system which perpetuated the effects of prior acts of discrimination would fall under the rationale of *Griggs,* [citation omitted]." *United States v. Trucking Employers, Inc., supra,* 182 U.S.App. D.C. at 321, 561 F.2d at 319 n. 24. I agree with this case, at least to the extent it would affect pre-Act discriminatees.

act would constitute an impermissible attack on the seniority system. "A contrary view would substitute a claim for seniority credit for almost every claim which is barred by limitations. Such a result would contravene the mandate of § 703(h)." *Evans, supra,* 431 U.S. at 560, 97 S.Ct. at 1890.

In the absence of a clearer statement from the Court qualifying *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), I conclude that Farris' timely-filed complaint alleging pre-Act discrimination with "continuing" effects, and not involving a bona fide seniority system, is remediable under Title VII. No other case in which this court has dealt with the *Evans* opinion has presented the precise question presented here. In *Martin v. Georgia-Pacific Corp.,* 568 F.2d 58 (8th Cir. 1977); *DeGraffenreid v. General Motors Assembly Div.,* 558 F.2d 480, 485 (8th Cir. 1977) and *Wells v. Meyer's Bakery,* 561 F.2d 1268, 1274 n. 5 (8th Cir. 1977) all the *post-*Act discriminatees had failed to make a timely filing.

Accordingly, I would affirm this portion of the district court opinion, as well as the decision on the merits,[4] as I believe the Board policy in this case constituted unlawful discrimination on the basis of sex under *Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 343 (1977).

---

[4]. Mandatory leave regulations of this duration also violate a woman's constitutional rights under the Due Process Clause of the fourteenth amendment, "because they employ irrebuttable presumptions that unduly penalize a female teacher for deciding to bear a child." *Cleveland Board of Education v. La Fleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974).

Although this case was decided under 28 U.S.C. § 1983 and not Title VII, it seems ironic that Ms. Farris could have recovered under a timely § 1983 action, but is not permitted to recover under a timely Title VII action.